# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JULIE GIBSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-1036-LWW |
| | ) | |
| DAVID KONICK, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| 23 WEST BAYARD STREET, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 5, 2024
Date Decided: July 10, 2024

Frank E. Noyes, OFFIT KURMAN, P.A., Wilmington, Delaware; *Counsel for Plaintiff Julie Gibson*

David Konick, pro se; *Defendant*

**WILL, Vice Chancellor**

This case presents an unusual dissolution request. The nominal defendant is a Delaware limited liability company with no operations, employees, or income. It has a single asset: a beach house in Fenwick Island.

The defendant—a lawyer—formed the company when he and the plaintiff were a couple, giving each equal membership interests. At the defendant's suggestion, they bought the then-dilapidated house through the company to limit taxes. The defendant prepared a limited liability company agreement with provisions favorable to him, which he told the plaintiff were standard. The parties worked to renovate the house and hoped it would bring them years of personal enjoyment.

This plan went awry when the parties' romantic relationship came to a bitter end. But their business relationship as co-owners of the company continues. The plaintiff wants to recover her investment, sell the house, and move on. The defendant will not let her.

After trial, there is no doubt that the entity must be dissolved. The governing agreement requires the members' unanimous approval to dissolve the company, and the members are deadlocked. The plaintiff cannot withdraw from the company without triggering punitive provisions depriving her of fair value. The "business" of jointly owning a vacation property is no longer practicable.

1

Given the company's function, the winding up process involves selling the property and dividing the proceeds. Some steps in that process are straightforward; others are hotly contested. The parties debate whether their lopsided mortgage payments recut their respective ownership interests. They each seek reimbursement for home improvement store receipts, furniture, and contractor fees. The defendant also asks to be paid back for his "sweat equity" and his legal services to the entity.

In the decision that follows, I grant dissolution of the company. I also interpret the governing agreement to outline the parties' interests and entitlement to reimbursement. But I decline the parties' invitation to oversee the sale of the property. A liquidating trustee will be appointed to that end.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. 23 West Bayard Street

Nominal defendant 23 West Bayard Street, LLC (the "Company") is a Delaware limited liability company with two members: plaintiff Julie (Coonce)

---

[1] Joint Pre-trial Order (Dkt. 116) ("PTO"). Trial testimony is cited as "[Name] Tr." *See* Dkts. 118, 120. Trial exhibits are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. *See* Dkt. 109. To the extent that conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

Gibson and defendant David Konick.[2]  Gibson is a Virginia resident.[3]  Konick, also a Virginia resident, is a lawyer admitted to practice in Virginia.[4]

Gibson first met Konick in 2017 when she sought to engage him for legal advice on a potential divorce.[5]  After Gibson became separated from her spouse, she moved about a mile away from Konick in Virginia.[6]  She developed a personal relationship with Konick, who was 29 years her senior.[7]  They became a couple by the summer of 2018.[8]

Soon after their relationship began, Gibson and Konick began to discuss purchasing a vacation home at 23 West Bayard Street Extension in Fenwick Island, Delaware (the "Property").[9]  The Property was well known to Konick.  It belonged to the family of his childhood friend.  Konick had stayed in the Property during the summer months since 2008 and, with the owners' permission, had docked a boat there.[10]

---

[2] PTO ¶ 1; *see* JX 14 ("LLC Agreement") § 2.7.

[3] *See* Gibson Tr. 7-8.

[4] PTO ¶ 4.

[5] Gibson Tr. 9-10.  She did not retain him.

[6] *Id.*

[7] *Id.* at 10; Konick Tr. 178.

[8] *See* Gibson Tr. 9-10.

[9] *See* JX 2; Gibson Tr. 12, 16.

[10] Konick Tr. 161.

The Property had fallen into disrepair during long periods of vacancy.[11] Its roof was leaking, walls were rotting, a large masonry fireplace and chimney were causing the house to sink into a marsh, and a front addition was separating from the original structure.[12] The house reeked of mold and lacked a functioning HVAC system or furnace.[13]

By 2019, the Property was the subject of numerous county repair notices and at risk of being condemned.[14] Rather than renovate the house, the original owners decided to sell it to Konick.[15] A purchase agreement for the Property was negotiated over several months until Konick walked away.[16] Gibson encouraged him to revive negotiations since she viewed the Property as a "long-term investment" that could be secured at a favorable price.[17]

In July 2020, Konick agreed to purchase the Property for $550,000 from Borodulia Family Properties, LLC (the "Seller").[18] Gibson and Konick intended to

---

[11] *Id.* at 161-62; *see* JX 7.

[12] *See* JX 5 at 1-4; *see generally* JX 22.

[13] *See* JX 4; JX 5 at 1-5; Konick Tr. 108-11, 162-68.

[14] Konick Tr. 167.

[15] *Id.*

[16] JX 5; *see* Konick Tr. 184.

[17] Gibson Tr. 13, 16; Konick Tr. 184.

[18] JX 7; PTO ¶ 7.

4

buy the Property together and renovate it.[19]  They wanted to use the Property for their own enjoyment rather than rent it out.[20]

## B.    The Purchase

To avoid real estate transfer taxes, Konick endeavored to structure the purchase as a "tax-free reorganization."[21]  This involved forming an entity that would operate as a subsidiary of the Seller: 23 West Bayard Street, LLC.[22]  The Seller would spin the property off to the Company and sell ownership interests in the Company (as opposed to the real estate itself) to Konick.[23]  The Company was formed as a Delaware limited liability company on August 3, 2020.[24]

The purchase was initially financed by equal contributions of $100,000 each from Gibson and Konick and a short-term promissory note in the principal amount of $350,000 owed to the Seller (the "Note").[25]  The Company was the primary obligor on the Note, and Konick and Gibson were joint guarantors.[26]  Monthly

---

[19] Gibson Tr. 12, 16.

[20] *Id.* at 16.

[21] *See* JX 5 at 52-54; Gibson Tr. 114; Konick Tr. 183, 206.

[22] JX 8.

[23] *See* JX 5 at 52-54; JX 7 ¶¶ 2, 3; Gibson Tr. 114-16, 125-26; Konick Tr. 205-06.

[24] LLC Agreement at Recitals.

[25] PTO ¶ 7; *see* JX 7 ¶ 6(b).

[26] PTO ¶ 8.

5

payments of $2,333.76 were owed and the remaining principal balance was to be paid in full by January 1, 2022.[27]

Konick made fourteen consecutive monthly payments on the Note totaling $32,672.64.[28] Konick made an additional $25,000 curtailment payment to extend the Note when it reached maturity.[29]

On March 9, 2022, the Note was largely paid off with a $300,000 loan from Nation Bank of Kansas City (the "Loan").[30] After closing costs, the net proceeds from the Loan were $297,035.42.[31] Konick paid the remaining balance on the Note of $7,663.24.[32]

Gibson and Konick are joint obligors on the Loan and continue to make payments.[33] They equally contribute to the $2,070.30 monthly payments.[34] The Loan is secured by liens on the Property and on Konick's primary residence in Virginia.[35]

---

[27] *Id.* ¶ 7; *see* JX 7 ¶ 6(b).

[28] PTO ¶ 8.

[29] *Id.*; *see* JX 16.

[30] PTO ¶ 9; *see* JX 18; JX 19; JX 20.

[31] PTO ¶ 9.

[32] *Id.*

[33] *See id.* ¶ 11.

[34] *Id.*

[35] *Id.*

## C. The LLC Agreement

Around the time the Loan was secured in March 2022, Konick presented Gibson with a limited liability company agreement (the "LLC Agreement") that he had drafted.[36] The LLC Agreement was "entered into as of" October 4, 2020.[37] It states that the Company's sole purpose was to acquire, develop, own, and lease residential property in Sussex County, Delaware.[38] The LLC Agreement contains an integration clause stating that it "constitutes the complete and exclusive statement of the Agreement among the Members" and "supersedes all prior written and oral statements," including a prior "Operating Agreement."[39]

The LLC Agreement confirms that Konick and Gibson were the Company's only two members and that each owned a 50% interest.[40] Exhibit A to the LLC Agreement also reflects that "as of October 4, 2020," Konick and Gibson each held a 50% interest in the Company based on their "[i]nitial [i]nvestment[s]" of $100,000.[41] These initial investments were used to pay the Seller when the Property

---

[36] Gibson Tr. 66-67; PTO ¶ 3. Gibson recalled that she had been presented with the LLC Agreement long after the Property was purchased in 2020 because the LLC Agreement references a home that she did not own until August 2021. Gibson Tr. 66-67; *see* LLC Agreement § 9.2.

[37] LLC Agreement at Recitals; *see* PTO ¶ 2.

[38] PTO ¶ 12; *see* LLC Agreement § 2.3.

[39] LLC Agreement § 9.3.

[40] *Id.* § 2.7.

[41] *Id.* at Ex. A.

was purchased. The LLC Agreement stated that neither member would "be required to contribute any additional capital to the Company," except to pay off the $350,000 Note.[42]

Although the LLC Agreement is titled "Member-Managed Limited Liability Company Agreement of 23 West Bayard Street, LLC," it states that the Company "shall be managed by one or more Managers."[43] Gibson and Konick designated Konick as the Company's "initial and sole Manager."[44] The Manager can only be removed by a vote of members "holding a two-thirds interest in the Company."[45]

The LLC Agreement reserves other decisions and actions to the members by requiring approval of more than 50% of the membership interests.[46] For example:

- borrowing more than $10,000 requires "unanimous consent of the Members";[47]

- compensating a member "for services performed by" the Company requires "approv[al] by the Members";[48]

- the "timing and amount of all distributions" is to be "determined by the Members";[49]

---

[42] *Id.* § 3.2.

[43] *Id.* § 5.1.

[44] *Id.* § 5.2.1.

[45] *Id.* § 5.2.2.

[46] *See* PTO ¶¶ 15(a)-(h).

[47] LLC Agreement § 5.1(f).

[48] *Id.* § 5.8.

[49] *Id.* § 4.6.1.

- the value of non-cash proceeds from a sale of Company assets is to be "determined by the Members" with proceeds allocated "in proportion to their percentage interests."[50]

Particularly relevant to this case, the dissolution of the Company requires "the unanimous written agreement of the Members."[51] The LLC Agreement cannot be amended without "written unanimous consent of all Members."[52]

## D. The Breakup

For a time, Gibson and Konick enjoyed the using Property and worked to improve it. Konick preferred to do the renovations himself and, throughout 2021 and 2022, worked extensively on the Property.[53] Gibson preferred to hire contractors and hired one to replace an unworkable bathroom.[54]

Gibson and Konick's relationship began to deteriorate in late 2021.[55] They separated and got back together several times over two volatile years.[56] The relationship became irreparably broken in August 2022.[57]

---

[50] *Id.* § 4.2.

[51] *Id.* § 7.1.2; *see* Konick Tr. 192.

[52] LLC Agreement § 9.3.

[53] *See* JX 22.

[54] Gibson Tr. 31-33.

[55] *Id.* at 81.

[56] *Id.* at 80-83.

[57] *See* Konick Tr. 180-81; Gibson Tr. 82-83.

This break-up was far from amicable. Gibson made clear that she no longer wanted to own and share the Property with Konick.[58] Konick made disparaging remarks about Gibson while refusing to take her calls.[59] He began removing Gibson's personal belongings from the Property and dropping them off at her Virginia residence.[60] When Gibson tried to access the Property, she discovered that Konick had taken the only available key.[61] Konick refused to let Gibson visit the Property unless he was also present.[62] He also cut off her access to the Company's joint bank account.[63]

Gibson sought legal recourse.[64] After retaining counsel, she became wise to "zingers" in the LLC Agreement she had signed.[65] Under Section 6.1, without Konick's consent, Gibson cannot transfer membership interests to anyone.[66] If she transfers her interests without Konick's approval, the transferee loses "Membership

---

[58] *See* Gibson Tr. 86-90.

[59] *Id.* at 84-85, 88, 99-100; *see also id.* at 84 (testifying that Konick became upset after she went on a date with someone else).

[60] *Id.* at 84.

[61] *Id.* at 86; Konick Tr. 299-300.

[62] Konick Tr. 289.

[63] Gibson Tr. 92.

[64] *Id.* at 89-90.

[65] *Id.* at 88.

[66] LLC Agreement § 6.1.

10

Rights."[67] These "Membership Rights" include "(i) interest; (ii) [the] right to inspect the Company's books and records; and (iii) the right to participate in the management of and vote on matters coming before the Company."[68] Under Section 6.2, if Gibson were to "Voluntarily Withdraw" from the Company, she would "not be entitled to receive the fair market value of the Member's Interest as of the date of the Voluntary Withdrawal."[69] That is, if Gibson were to withdraw from the Company by resignation, she would forfeit her right to receive fair market value for her interests.

### E. This Litigation

On November 16, 2022, Gibson filed a Verified Complaint in this court advancing three counts.[70] Count I is a claim for judicial dissolution under 6 *Del. C.* § 18-802.[71] Count II is a claim for declaratory relief. Gibson seeks a declaration that her and Konick's capital accounts have equal value and that she is entitled to an equal 50% share of the net proceeds from the dissolution of the Company and sale of the Property.[72] She also seeks a declaration that Konick is not

---

[67] PTO ¶ 17; *see* LLC Agreement § 6.1.

[68] PTO ¶ 17; *see* LLC Agreement § 1.

[69] LLC Agreement § 6.2; *see* PTO ¶ 17.

[70] Dkt. 1.

[71] Verified Compl. for Judicial Dissolution and Declaratory J. ("Compl.") ¶¶ 51-55.

[72] *Id.* ¶¶ 62-64.

11

entitled to indemnification or advancement of expenses by the Company or the use of Company funds for his defense in this litigation.[73] Count III is a claim for a breach of Section 5.9.1 of the LLC Agreement, which provides that each member "shall have a general fiduciary duty" to the Company.[74]

After filing the litigation, Gibson continued to communicate with Konick. She called him; he would not answer. When she went to his home in January 2024 to discuss the Property, he told her she was trespassing.[75] No negotiated path forward was reached.

Meanwhile, Konick both moved to dismiss and answered the complaint, asserting seven affirmative defenses.[76] Konick then filed a barrage of motions. This included two motions to strike,[77] a motion to compel,[78] a motion for "craving oyer,"[79] and two Rule 41(b) motions.[80] All were denied.[81]

---

[73] *Id.* ¶¶ 59-61.

[74] *Id.* ¶¶ 67-72; *see* LLC Agreement § 5.9.1.

[75] Gibson Tr. 83-84.

[76] Dkts. 9, 10, 18. Because Konick filed an answer to the complaint, I deemed his motion to dismiss as a motion for judgment on the pleadings under Court of Chancery Rule 12(c).

[77] Dkts. 24, 51.

[78] Dkt. 38.

[79] Dkt. 63.

[80] Dkts. 76, 88.

[81] *See* Dkts. 31, 70, 72, 93, 95.

A one-day trial was held on February 28, 2024.[82] After post-trial briefing, this matter was submitted for decision on April 5.[83] Gibson's post-trial briefing did not address her claim in Count III claim for breach of Section 5.9.1 of the LLC Agreement.[84] The remaining claims are resolved below.

## II. LEGAL ANALYSIS

Gibson's primary claim is for judicial dissolution of the Company under 6 *Del. C.* § 18-802. Because it is no longer reasonably practicable to maintain the LLC, that relief is appropriate. Gibson and Konick are deadlocked on whether to dissolve the Company and the LLC Agreement lacks a feasible deadlock-breaking mechanism.

I go on to conclude that Konick is a 60.51% member and Gibson is a 39.49% member of the Company based on their capital contributions. I also address their entitlement to recover certain expenses and reject Konick's demand that he be compensated for certain services.

Finally, I appoint a liquidating trustee to oversee the winding up of the LLC and sale of the Property.

---

[82] Dkts. 118, 120.

[83] Dkts. 125, 126.

[84] *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (concluding that a party waived an argument by not including it in its opening post-trial brief); *see also Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003).

## A.      Judicial Dissolution

The LLC Agreement permits dissolution upon "the entry of a decree of judicial dissolution under 6 *Del. C.* § 18-802."[85]   Under Section 18-802, "on application by or for a member or manager," this court "may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[86]

A petitioner need not "show that the purpose of the [LLC] has been 'completely frustrated.'"[87] Dissolution may be appropriate where "the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill."[88] Even if a business can function, the analysis considers whether the "entity is otherwise stuck within a 'residual, inertial status quo' that prevents it from 'operating or from furthering its stated business purpose.'"[89]

---

[85] LLC Agreement § 7.1.4.

[86] 6 *Del. C.* § 18-802.

[87] *Fisk Ventures LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13), *aff'd*, 984 A.2d 124 (Del. 2009).

[88] *In re Arrow Inv. Advisors*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009).

[89] *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021) (quoting *Fisk Ventures*, 2009 WL 73957, at *4).

There is no "blueprint for determining whether it is 'not reasonably practicable' for an LLC to continue."[90] But "several factual circumstances indicative of a lack of 'reasonable practicability' have 'pervaded the case law.'"[91] These factors are: "(1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate."[92] The factors are not mandatory and no single factor is dispositive.[93]

1. Deadlock

The LLC Agreement provides that the "powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by one or more Managers."[94] Certain matters, though, are reserved for decision by the members.[95] They include dissolving the LLC, which requires "the unanimous written agreement of the Members."[96] Amending the LLC

---

[90] *In re GR Burgr, LLC*, 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017).

[91] *Seokoh*, 2021 WL 1197593, at *8 (quoting *Fisk Ventures*, 2009 WL 73957, at *4).

[92] *Fisk Ventures*, 2009 WL 73957, at *4; *see also Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2009 WL 4052681, at *5 (Del. Ch. Nov. 12, 2009).

[93] *See Seokoh*, 2021 WL 1197593, at *8; *Fisk Ventures*, 2009 WL 73957, at *4.

[94] LLC Agreement § 5.1.

[95] *See supra* notes 46-52 and accompanying text; *e.g.*, LLC Agreement §§ 5.1(j), 5.2.2, 7.1.2.

[96] LLC Agreement § 7.1.2.

15

Agreement or selling the Property similarly require unanimous member consent.[97] The LLC Agreement lacks a tie breaking clause.

Konick argues that Gibson is no longer a 50% member of the Company since he has made more capital contributions than her.[98] He believes that based on his payments on the Note and Loan, his capital account stands at $188,109.18 to Gibson's $122,773.30 and that he now holds 60.51% to Gibson's 39.49%.[99] Even if he were right, it would have no effect on the present deadlock insofar as 2/3 or unanimous members consent is required.

Konick maintains that there is no deadlock since Gibson did not pursue a formal meeting of the Company's members to vote on selling the Property or dissolving the Company before pursuing relief in this court. But there is no requirement that a petitioner pursue such actions before claiming deadlock. "Delaware law does not require a member to plead she made performative proposals she knew would be dead-on-arrival as a predicate to seeking judicial dissolution."[100] Gibson tried in vain to communicate with Konick both before and during this litigation. He repeatedly (even cruelly) rebuffed her and denied her access to the Property.

---

[97] LLC Agreement § 9.3; *see id.* §§ 4.2, 4.6.1, 4.6.2, 7.1.2.

[98] *See* Def.'s Post-trial Br. (Dkt. 125) 21-24; Konick Tr. 268.

[99] *See* Def.'s Post-trial Br. 22; JX 16.

[100] *Seokoh*, 2021 WL 1197593, at *11.

16

Although Konick is the Company's manager, its two members are hopelessly deadlocked. The very fact of this lawsuit evidences Gibson's desire to dissolve the Company and recover her investment.[101] Konick wishes to retain the Property through the Company.[102] The end of Gibson and Konick's romantic relationship has left them unable to amicably communicate for the past two years, let alone reach consensus on matters requiring 2/3 or unanimous member approval. Given the mutual hostility expressed at trial, I see no potential for them to resolve their differences in a way that provides a path forward.[103] Gibson has proven deadlock.

### 2. No Deadlock Breaking Mechanism

The LLC Agreement lacks a viable means for breaking the deadlock. Konick insists that Section 7.1.2 is an "anti-deadlock provision" because it permits the members to agree on dissolution.[104] That is illogical. Section 7.1.2's requirement that dissolution have unanimous member consent is the very reason the present

---

[101] Pl.'s Post-trial Br. (Dkt. 126) 19.

[102] *See* Def.'s Post-trial Br. 29.

[103] *See Haley v. Talcott*, 864 A.2d 86, 96 (Del. Ch. 2004) (finding that the parties were at an impasse based on evidence including that they had "not interacted since their falling out" a year before and their "open hostility" toward one another).

[104] Def.'s Post-trial Br. 33; Konick Tr. 193-94.

deadlock on dissolution exists. In fact, Konick himself views the provision as leaving Gibson "stuck in the deal."[105]

Sections 6.1 and 6.2 of the LLC Agreement outline how Gibson could exit her investment in the Company. But these exit mechanisms are insufficient alternatives to dissolution. Section 6.1 of the LLC Agreement prevents Gibson from effectively transferring her shares to anyone other than Konick, who has declined to purchase them.[106] And Section 6.2 prevents her from receiving the fair market value of her membership interests if she voluntarily withdraws from the LLC.[107] Konick acknowledges that the exit provisions are "onerous."[108] Proceeding under Sections 6.1 and 6.2 would not permit Gibson "a fair opportunity" to "exit and receive the fair market value of her interest."[109]

Konick argues otherwise based on the text in Section 6.1 stating that each member acknowledges "the reasonableness of these restrictions in view of the

---

[105] Konick Tr. 255 ("I said she is stuck because the operating agreement says it can't be sold unless its unanimous. So, in my view, she was stuck in the deal."); *see also id.* at 187-88.

[106] LLC Agreement § 6.1; *see* Konick Tr. 255. During trial, Konick asked that I give the parties time to decide whether one is able to buy the other's interest in the Company. Konick Tr. 252. As I remarked at the close of trial, he has had ample time. *Id.* at 292. The case has not resolved in the more than 20 months since it was filed.

[107] LLC Agreement § 6.2.

[108] Konick Tr. 188.

[109] *Haley*, 864 A.2d at 96; *see also In re Dissolution of T&S Hardwoods KD, LLC*, 2023 WL 334674, at *7 (Del. Ch. Jan. 20, 2023) (explaining that a viable exit mechanism is one that is "equitable in its operation").

18

purposes of the Company and the relationship of the Members."[110]  That provision carries little weight.  The parties' purpose of enjoying the home over the long-term is frustrated and their relationship is irreconcilably damaged.  Gibson and Konick can no longer negotiate a separation of Gibson's membership in a reasonable way.[111] Gibson's only viable path to exit the Company and recover her investment is through judicial dissolution.[112]

### 3.    Frustration of Purpose

The LLC Agreement defines the Company's purpose as "to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, and otherwise deal in real property in Sussex County, Delaware . . . and do any and all things necessary, convenient, or incidental to that purpose."[113]  The Company has no operations.  The Property is and has always been the Company's sole asset.[114]  The Property has never been rented out or otherwise generated income.[115]  The parties have also not

---

[110] LLC Agreement § 6.1; *see* Def.'s Post-trial Br. 8-9.

[111] *See Seokoh*, 2021 WL 1197593, at *15.

[112] Although it is hypothetically possible for Konick to purchase Gibson's membership interests, he has refused to do so.  *See* Konick Tr. 255; *supra* not 105 and accompanying text.

[113] LLC Agreement § 2.3.

[114] PTO ¶ 13.

[115] *Id.* ¶ 5.

19

contemplated buying other properties through the Company.[116]  Their intention was to improve the property for personal enjoyment.[117]

Konick has retained the use of the Property.  But he has blocked Gibson from accessing it.[118]  Meanwhile, she has ongoing financial obligations through the Loan. Given the deterioration of her ties to Konick, she is unwilling to continue to cover costs and maintenance associated with the Property.  Konick, too, has expressed concerns about his ability to afford the Property and its upkeep.[119]  The Company's ability to procure a new loan of $10,000 or more without unanimous member consent further hamstrings its viability.[120]

Although it may be feasible for the Company to continue holding the Property, that would hardly fulfill its intended purpose.  The present situation benefits only Konick.  Gibson has been deprived of the upside while she continues to pay costs, with no guarantee of recovering them.  The parties' intended purpose of using the Property for pleasure and long-term investment has been meaningfully frustrated.[121]

---

[116] *Id.* ¶ 6.

[117] *E.g.*, Gibson Tr. 12; Konick Tr. 202.

[118] *See* Konick Tr. 288-89.

[119] *Id.* at 171.

[120] *See* LLC Agreement § 5.1(f).

[121] Although Konick contends that as the Company's manager he has authority to determine who can use and access the Property, this purported authority is not found in the LLC Agreement.  *See* Konick Tr. 287.

*        *        *

The parties' deadlock, the lack of a deadlock-breaking provision or viable exit mechanism in the LLC Agreement, and the frustration of the Company's purpose demonstrate that it is not reasonably practicable for the Company's business to continue. Dissolution under Section 18-802 is warranted. Judgment on Count I is in Gibson's favor.

**B.  Relative Ownership Interests and Reimbursement**

Gibson seeks a declaration that she remains a 50% member of the Company. Konick disagrees, citing to the parties' capital contributions, out of pocket expenses, and his provision of services to the Company. The parties' respective membership interests must be adjusted based on their capital contributions at the time of trial. They will be entitled to recover certain out of pocket expenses used to improve the Property. But Konick is not entitled to recover for his services.

### 1.  Ownership Percentages

Section 2.7 of the LLC Agreement provides that the "Percentages" owned by Konick and Gibson are 50% of the Company's total interests.[122] Those "Percentages" are also reflected Exhibit A to the LLC Agreement. Exhibit A states that the ownership "Percentage" of Gibson and Konick are 50%.[123]

---

[122] LLC Agreement § 2.7.

[123] *Id.* at Ex. A.

21

The term "Percentage" is defined in the LLC Agreement as "the percentage set forth after the Member's name on Exhibit A, as amended from time to time based on each Member's capital contributions."[124]  The members' initial capital contributions were $100,000 each, supporting the 50% allocation of membership interests in Exhibit A to the LLC Agreement as drafted.[125]  Section 3.2 states that no further capital contributions were required, "[e]xcept for funds necessary to discharge the [Note]" of $300,000.[126]

Gibson argues that the parties' interests remain 50/50 irrespective of their additional capital contributions.[127]  She reads the word "amended" in the definition of "Percentages" to require that Exhibit A to the LLC Agreement be formally amended under Section 9.3 for the parties' initial interests to change.  I disagree. "Amended" is not a defined term.  It means "to change or modify."[128]  To require the members to unanimously consent to a formal amendment to Exhibit A to adjust

---

[124] *Id.* § 1.

[125] *Id.* at Ex. A; *see id.* § 3.1 (discussing the initial capital contributions).

[126] *Id.* § 3.2.

[127] Pl.'s Post-trial Br. 18-19.

[128] *Amended*, Merriam-Webster, https://www.merriam-webster.com/dictionary/amended (last visited July 6, 2024); *see Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

their respective ownership stakes would be commercially unreasonable.[129] If that were required, either party could block the other from adjusting his or her stake, regardless of their relative capital contributions.

The definition of "Percentages" unambiguously reflects the parties' intention that their ownership interests correspond to their capital contributions. Exhibit A can be changed at any time to reflect those interests. Because capital contributions toward the Note were required by Section 3.2, the parties' interests should fairly match their payments toward the Note and successor Loan.

Konick made all payments on the Note—14 monthly payments of $2,333.76 each totaling $32,672.54.[130] Konick also made a $25,000 "curtailment payment" and paid an additional $7,364.24 at closing to pay off of the Note.[131] The balance of the Note was paid through the Loan. As of the trial, Gibson and Konick have made equal payments on the Loan of $2,070.30, totaling $45,546.60 ($22,773.30 each).[132] These payments are appropriately credited towards the parties' capital contributions.

Konick has made capital contributions of $188,109.18, corresponding to a 60.51% interest. Gibson has made capital contributions of $122,773.30,

[129] *See Manti Hldgs., LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1211 (Del. 2021) ("[I]nterpretations that are commercially unreasonable or that produce absurd results must be rejected.").

[130] PTO ¶ 8; *see* JX 26; Konick Tr. 123.

[131] JX 26; PTO ¶ 8.

[132] *See* JX 26; JX 35; PTO ¶ 11.

corresponding to a 39.49% interest. Declaratory relief will be issued to this effect for Count II.

### 2.    Reimbursement of Out of Pocket Expenses

At trial, the parties presented extensive evidence of their expenditures toward improving the Property. Konick contends that they should be counted as capital contributions. Gibson, however, insists that they are reimbursable out of pocket expenses rather than capital contributions.

A capital contribution is funds or assets invested into the business itself.[133] The LLC Agreement defines "Capital Contribution" as "the total amount of cash and the fair market value of any other assets contributed or deemed contributed under the [Internal Revenue Code]."[134] The $100,000 payments to acquire the Property— the focal point of the business—and pay the Note and Loan on the Property are considered "Additional Capital Contributions" under Section 3.2.[135] Expenses, on the other hand, are costs incurred from operating the business.[136] Funds used for

---

[133] *See Capital Contribution*, Black's Law Dictionary (12th ed. 2024) (defining "capital contribution" as "[c]ash, property, or services contributed by partners to a partnership").

[134] LLC Agreement § 1.

[135] *Id.* § 3.2.

[136] *See Expense*, Black's Law Dictionary (12th ed. 2024) (defining "expense" as "[a]n expenditure of money, time, labor, or resources to accomplish a result").

materials, supplies, and contractors to improve the Property are fairly viewed as expenses. The costs at issue fall into the latter category.[137]

Section 5.8 of the LLC Agreement states that "upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the business of the Company."[138] The record includes a spreadsheet detailing each member's expenses toward the remodeling and construction work at the Property.[139] This spreadsheet states that Konick's expenses total $260,814.08 and that Gibson's expenses total $197,120.42.[140] But these expenses include the payments on the Note, the curtailment payment, and payments on the Loan.

To the extent that the expenses are not included in the capital contributions discussed above, are substantiated, and were "reasonably incurred in connection with" the Company's business, they are recoverable under Section 5.8 of the LLC Agreement.[141] Certain expenses, though, are a stretch. For example, Gibson seeks

---

[137] *See* JX 26 (summarizing expenses and attaching receipts); *see* JX 31; JX 33.

[138] LLC Agreement § 5.8.

[139] JX 26.

[140] *Id.*

[141] The LLC Agreement requires reimbursement of expenses to creditors and acknowledges that Section 7.2 acknowledges that the members can be creditors. Pl.'s Post-trial Br. 24. Gibson invokes this provision regarding the same expenses for which the parties seek reimbursement under Section 5.8. *See* LLC Agreement §§ 5.8, 7.2. Because the expenses are reimbursable under Section 5.8, I need not address Section 7.2.

reimbursement for the purchase of televisions and furniture, for Konick's cell phone, for cable television, and for a gas station gift card she purchased for Konick.[142] These seem to be living expenses, rather than business expenses toward renovating or improving the Property. Other expenses for which reimbursement is sought lack substantiation.[143] As discussed below, a liquidating trustee will assess the expenses consistent with this guidance.

### 3. Compensation for Services

Konick also seeks to be paid for the "sweat equity" he contributed to the Company, relying on unjust enrichment and quantum meruit theories.[144] He asks to be compensated for legal services at a rate of $250 per hour totaling $9,950.[145] He also demands compensation for "design, construction, labor, and supervision" services at a rate of $75 per hour for a total of $61,690.[146]

Konick insists that Gibson would be unjustly enriched if the Company were to be dissolved since the value of the Property has increased from $550,000 in 2020

---

[142] *See* JX 33.

[143] *See* JX 31.

[144] Def.'s Post-trial Br. 38-42. These theories were improperly raised as affirmative defenses rather than compulsory counterclaims. Dkt. 18. Gibson opted not to challenge them on that basis. *See* Dkt. 113. They fail in any event.

[145] JX 23.

[146] JX 24.

to over $1 million in value due (in part) to his efforts.[147]    Similarly, he claims entitlement to payment "on a quantum meruit" basis.[148]  But Konick is constrained by the very terms of the LLC Agreement he drafted.[149]  Delaware courts have repeatedly held that there can be no recovery on unjust enrichment or quantum meruit grounds when a contract governs the parties' relationship.[150]

Section 5.8 of the LLC Agreement states that "[u]nless approved by the members, no member shall be entitled to compensation for services performed by the Company."[151]  Konick argues that this provision is no bar to compensation

---

[147] Gibson Tr. 138-39; *see* Def.'s Post-trial Br. 38-39.

[148] Def.'s Post-trial Br. 41.

[149] There is another problem with Konick's request for "legal services" payments: he is not barred in Delaware.  His testimony prompts one to question whether his services constituted the unauthorized practice of law in Delaware. *See, e.g.*, Konick Tr. 205-06 ("I was doing legal work to facilitate the implementation of the sale agreement for the [Delaware] entity that I was supposed to get.  So that may or may not be some technical violation[.]").  Seeking compensation for these services heightens this concern.

[150] *See, e.g.*, *Poppiti v. Conaty*, 2013 WL 1821621, at *4 (Del. Ch. May 1, 2013) ("[Q]uantum meruit is a quasi-contractual principal that only operates in the absence of an express agreement."); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."); *S'holder Representative Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *1 (Del. Ch. May 22, 2019) ("[A]n unjust enrichment claim cannot lie when a contract governs the parties' relationship[.]"); *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the measure of [the movant's] right, there can be no recovery under an unjust enrichment theory independent of it.").  Konick acknowledges this reality. *See* Def.'s Post-trial Br. 41 n.18 ("It is well established that the Court will not consider a *quantum meruit* claim against an owner when a party has a contractual avenue for recovery.").

[151] LLC Agreement § 5.8.

because these services "were not performed 'by the Company.'"[152]  But as Lord Chancellor Thurlow of England once observed, a business entity "has no soul to be damned, and no body to be kicked."[153]  An LLC lacks arms to put up drywall or hands to draft legal agreements.  The only reasonable reading of Section 5.8 is that a member's services provided "to" or "for the Company" are not compensable.  Accordingly, Konick is not entitled to recover for personal or renovation-related services.

### 4.    Advancement or Indemnification

Gibson also seeks a declaration that Konick is not entitled to use Company funds to reimburse his legal fees and expenses in this litigation.[154] It is unclear whether she continues to press this claim after trial.  That may be because the parties stipulated that the LLC Agreement "does not provide for indemnification or advancement of the managing member's expenses or attorneys' fees."[155]

I decline to issue declaratory relief on this aspect of Count II.  The parties' post-trial briefing is silent on the subject and there is agreement on the absence of a contractual right to indemnification or advancement.  Konick has also not sought advancement or indemnification, leaving the issue unripe.  To resolve it now would

---

[152] Def.'s Post-trial Br. 38.

[153] Mervyn King, *Public Policy and the Corporation* 1 (1977).

[154] *See* Compl. ¶ 61; Pl.'s Opening Pre-trial Br. (Dkt. 96) 24-25.

[155] PTO ¶ 18; *see* 6 *Del. C.* § 18-108.

28

amount to an advisory opinion. If Konick later pursues advancement or indemnification out of the Company's funds, Gibson is not barred from raising the issue anew.

## C. Appointment of a Liquidating Trustee

The parties' post-trial briefs discuss potential plans of dissolution.[156] They have tentatively agreed on a local realtor to list and market the Property and that the first priority after a sale is to pay off the Loan.[157] They insist that there is no need for the court to appoint a liquidating trustee.

There are, however, many issues left to be resolved in selling the Property and winding up the Company's affairs. Konick and Gibson's deadlock leaves them unable to direct this process. To limit any dysfunction, they ask that I determine the fair market value of the Property and set a threshold price above which the parties must accept an offer. They also ask that I oversee the disbursement of proceeds and assess whether individual out of pocket expense are reimbursable.[158]

These issues fall at the outermost bounds of my purview—if not beyond. The trial record leaves me with no confidence that the parties can cooperate on how the winding up should proceed. And I am ill-suited to break up disagreements over the

---

[156] Pl.'s Post-trial Br. 29-33; Def.'s Post-trial Br. 46-47.

[157] Pl.'s Post-trial Br. 32; Def.'s Post-trial Br. 46.

[158] *See* Pl.'s Post-trial Br. 29-33; Def.'s Post-trial Br. 46.

sale of a Fenwick Island beach house. Although Gibson did not seek the appointment of a liquidating trustee under Section 18-803, I believe it is prudent to appoint one pursuant to this court's equitable powers.[159] The court appoints Seth L. Thompson, Esquire to serve in this capacity.

As liquidating trustee, Mr. Thompson will be tasked with overseeing the sale of the Property. With notice to and in consultation with the parties, he will make a recommendation to the court on how to dissolve the Company, dispose of its assets, and resolve its affairs. This proposal will include the allocation of sale proceeds among the members relative to their ownership interests and the reimbursement of out of pocket expenses, consistent with this decision and the LLC Agreement.

Mr. Thompson is asked to prepare a proposed order of appointment and to attempt to attain the parties' assent to that order. The order should reflect that Mr. Thompson has the broadest authority contemplated by the LLC Act.

---

[159] *See Spellman v. Katz*, 2009 WL 418302, at \*4 n.28 (Del. Ch. Feb. 6, 2009) ("Although the Court relies upon 6 *Del. C.* § 18-803(a) to appoint a liquidating trustee, the same authority may well be found in the Court's traditional equitable powers."); *see also Vila v. BVWebTies LLC*, 2010 WL 3866098, at \*13 (Del. Ch. Oct. 1, 2010) (appointing a liquidating trustee "with the broadest possible fiduciary powers to wrap up its affairs"); 6 *Del. C.* § 18-803 ("[T]he Court of Chancery, upon cause shown, may wind up the limited liability company's affairs upon application of any member . . . and in connection therewith, may appoint a liquidating trustee.").

## III. CONCLUSION

For the reasons set forth above, judicial dissolution of the Company is warranted under 6 *Del. C.* § 18-802. 23 West Bayard Street, LLC will be dissolved. As for the declaratory relief sought in Count II, Gibson is a 39.49% member of the Company and Konick is a 60.51% member of the Company. Seth L. Thompson, Esquire will serve as liquidating trustee. Within 14 days, and after notice to the parties, Mr. Thompson is asked to file a proposed order implementing this decision and outlining the scope of his appointment.